# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 50112 | **DATE** | 1/30/2001 |
| **CASE TITLE** | | DeKalb vs. Pioneer | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, Pioneer's motion for summary judgment on non-infringement is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| X | No notices required, advised in open court. | | | number of notices | Document Number |
| | No notices required, picked up by counsel | | | | |
| | Notices mailed by judge's staff. | | JAN 3 1 2001 | | 587 |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | picked up 1-30-01 | | |
| /SEC | courtroom deputy's initials | 2001 JAN 30 PM 2: 22 date/time received in central Clerk's Office | date mailed notice | mailing deputy initials | |


THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

DEKALB GENETICS CORPORATION,  )
                               )
          Plaintiff,           )
                               )
     v.                        )     No. 96 C 50112
                               )
PIONEER HI-BRED                )
     INTERNATIONAL, INC.       )
                               )
          Defendant.           )

## MEMORANDUM OPINION AND ORDER

### Introduction

On September 18, 2000, defendant Pioneer Hi-Bred
International, Inc. ("Pioneer") filed a motion for summary
judgment that its YieldGuard corn product does not infringe
United States Patent No. 5,484,956 ("the '956 patent") owned by
plaintiff DeKalb Genetics Corporation ("DeKalb"). DeKalb opposed
Pioneer's motion for summary judgment. The issue of non-
infringement was referred to the Special Master who heard the
parties' arguments at a hearing on November 11, 2000. The
Special Master then filed his Report and Recommendation with the
court on November 9, 2000 wherein he recommended that Pioneer's
motion for summary judgment be denied. Pursuant to Federal Rule
of Civil Procedure 53(e), Pioneer and DeKalb filed objections to
the Special Master's Report. Subsequently, at a hearing on
December 4, 2000, information regarding a recent settlement
agreement entered into between the parties was revealed to the
court. During a telephonic conference on December 11, 2000, the

court set an additional briefing schedule for the parties to address the impact of this settlement agreement dated June 1, 2000 ("the 2000 Agreement").

Pioneer's motion has been briefed, reviewed by the Special Master, then re-briefed. Upon consideration of the record to date, including the events subsequent to the Special Master's Report and Recommendation and the parties' objections thereto, the court denies Pioneer's motion for summary judgment regarding non-infringement.

## Facts

Since 1996, in this judicial district and in at least two other federal district courts, the parties, along with their subsidiaries, parents and partners, have been involved in various legal disputes concerning the technology of fertile transgenic corn. DeKalb filed the present action, Case No. 96 C 50112 ("the Rockford litigation") on April 30, 1996. On March 27, 1997 Pioneer filed a lawsuit in the Western District of Wisconsin against Monsanto Company ("Monsanto") which was eventually transferred to the Eastern District of Missouri, Case No. 4:97CV01609. ("the St. Louis litigation"). Although the details of the St. Louis litigation are not at issue here, the Missouri district court's recent entry of judgment against Pioneer impacts the pending motion regarding non-infringement and is discussed below.

**The St. Louis Litigation**

The St. Louis litigation concerned a joint development agreement between Pioneer and Monsanto that was executed on July 1, 1993 ("the 1993 Agreement"). The 1993 Agreement granted Pioneer a limited license of patent rights relating to a genetically engineered elite corn line based on the bacterium Bacillus thuringgiemis (Bt) that Monsanto manufactured. Pioneer was to pay Monsanto $38 million for the use of the Bt corn line in order to commercialize Pioneer's YieldGuard product. In the St. Louis litigation, Pioneer brought a declaratory judgment action concerning the 1993 Agreement and sought a freedom to operate license from Monsanto for all of the DeKalb patents. Monsanto in turn filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56, arguing that it had no obligation to provide Pioneer with a license to the DeKalb patents. The Missouri district court agreed with Monsanto and granted its motion for summary judgment on this issue.

Monsanto also filed a number of counterclaims in the St. Louis litigation, including a counterclaim that Pioneer materially breached the 1993 Agreement. On August 24, 2000, a jury returned a verdict in favor of Monsanto, finding Pioneer breached the 1993 Agreement in several respects. Recently, on January 2, 2001, the Missouri district court in the St. Louis

litigation entered final judgment, terminating the
Pioneer/Monsanto 1993 Agreement as of June 12, 1998.

### The Rockford Litigation

On April 30, 1996, DeKalb filed a patent infringement suit
in the district court in Rockford, alleging that Pioneer's
YieldGuard product infringed the '956 patent. YieldGuard is
Pioneer's commercial corn product derived from the technology
developed and licensed under the provisions of the 1993
Agreement. Since the commencement of the Rockford litigation,
DeKalb has become the wholly owned subsidiary of Monsanto and
Monsanto has conceded that it controls the business of DeKalb and
now controls DeKalb's interest in the present litigation. On
June 1, 2000, the parties executed a partial settlement agreement
on certain issues of the litigation pending in the various
district courts at that time ("the 2000 Agreement").

The Special Master was not afforded the benefit of
Monsanto's concession of its control of DeKalb at the time the
Report and Recommendation on non-infringement was filed.
Furthermore, the Special Master was not told of the 2000
Agreement between the parties and could not consider the
implications of this agreement when issuing his recommendation of
non-infringement to this court. Finally, the Special Master's
Report was filed prior to the Missouri district court's entry of
final judgment in the St. Louis litigation terminating the 1993

Agreement. Therefore, the Special Master assumed that the 1993 Agreement was valid and would remain in effect until January 1, 2003. Since the Missouri district court's final judgment belies the Special Master's assumption, this court addresses Pioneer's present motion for summary judgment with the understanding that the 1993 Agreement is terminated as of June 12, 1998.

## Legal Standards

Summary judgement, pursuant to Federal Rule of Civil Procedure 56(c), is as appropriate in a patent case as it is in any other case. <u>C.R.Bard, Inc. v. Advanced Cardiovascular Sys.</u>, 911 F.2d 670, 672 (Fed. Cir. 1990). A motion for summary judgment is properly granted when there is no genuine issue as to any material fact, consequently entitling the moving party to judgment as a matter of law. <u>General Elec. Co. v. Nintendo</u>, 179 F.3d 1350, 1353 (Fed. Cir. 1999). "When ruling on a motion for summary judgment, all of the non-movant's evidence is to be credited, and all justifiable inferences are to be drawn in the non-movant's favor." <u>Stryker Corp. v. Davol</u>, Nos. 99-1202, 99-1555, 2000 App. Lexis 31527 (Fed. Cir. 2000) (found at 234 F.3d 1252); <u>see</u> <u>also</u> <u>Caterpillar Inc. v. Deere & Co.</u>, 224 F.3d 1374, 1379 (Fed. Cir. 2000)("Summary judgment is improper 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'").

Therefore, the movant of a motion for summary judgment bears the burden of demonstrating the absence of any genuine issue of material fact and that the party so moving is entitled to judgment as a matter of law. When challenging the validity of an issued patent, the movant faces the burden of overcoming the presumption of validity afforded by 35 U.S.C. § 282, which requires a party challenging validity to prove the facts establishing invalidity by clear and convincing evidence. Stryker, 2000 App. Lexis at *17 (citing Verdegaal Bros., Inc. v. Union Oil Co., 814 F.2d 628, 631 (Fed. Cir. 1987)).

Infringement, either literal or under the doctrine of equivalents, is a question of fact. Bai v. L&L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998). Determining whether an accused process or device infringes a patent claim is a two-step process. "The first step is claim construction which involves ascertaining the scope and meaning of the claims at issue, while the second step involves determining whether the claims as construed read on the accused device." Streamfeeder, LLC v. Sure-Feed Sys., Inc., 175 F.3d 974, 981 (Fed. Cir. 1999); see also Personalized Media Communications, L.L.C. v. International Trade Comm'n, 161 F.3d 696, 701 (Fed. Cir. 1998)(same). The Special Master construed the claims of the '956 patent in its Report and Recommendation, following a Markman hearing, which this court accepted in its entirety on September 19, 1999. Thus, the step remaining in the

6

infringement analysis is the comparison of the construed claims to the accused device.

Finally, the court reviews the Special Master's legal conclusions *de novo*, and accepts the findings of fact in the Report and Recommendation unless they are clearly erroneous. <u>Cook v. Niedert</u>, 142 F.3d 1004, 1010 (7th Cir. 1998).

## **Analysis**

Pioneer maintains two arguments in support of its motion for summary judgment of non-infringement. First, Pioneer asserts that DeKalb's position regarding the infringement of dependent claim 6, without alleging the infringement of the claims from which claim 6 depends, is inconsistent with patent law. In form, claim 6 is a dependent claim which references its preceding patent claims, claims 1 and 5, and adds an additional limitation. Since DeKalb has not alleged the infringement of either claim 1 or 5, Pioneer posits that claim 6 cannot be found to be infringed.

Pioneer's second argument for a finding of non-infringement is grounded in an implied license/patent exhaustion defense stemming from the 1993 and 2000 Agreements between Monsanto and Pioneer. Pioneer contends that through Monsanto's acquisition of DeKalb, the expressed license of Monsanto technology granted to Pioneer by the 1993 Agreement should also grant Pioneer an implied license to the '956 patent. Pioneer argues that the

7

language of the 2000 Agreement confirms Monsanto's intention to give Pioneer this license.  For the following reasons, the court does not find Pioneer's arguments persuasive, and its motion for summary judgment regarding non-infringement is, therefore, denied.

### The dependent nature of claim 6 of the '956 patent

Pioneer aptly interprets paragraphs 2 and 4 of 35 U.S.C. § 112 and correctly states the general principle concerning the infringement of dependent claims.  A dependent claim cannot be found to infringe unless the independent claim is also seen to infringe.  <u>Wahpeton Canvas Co. v. Frontier, Inc.</u>, 870 F.2d 1546, 1553 (Fed. Cir. 1989); <u>see</u> <u>also</u> <u>Jeneric Penton, Inc. v. Dillon Co.</u>, 204 F.3d 1377 (Fed. Cir. 2000).  The Federal Circuit has interpreted these sections accordingly.  However, this general principle has an equally accepted exception articulated in <u>Wilson Sporting Goods, Co. v. David Geoffrey & Assoc.</u>, 904 F.2d 677, 683-684 (Fed. Cir. 1990).  Pioneer further argues non-infringement by stating that claim 6 incorporates all of the steps in claims 1 and 5 (claim 6 is the "child" of claim 5 and the "grandchild" of claim 1), and since the product claimed in claim 1 was produced before the '956 patent issued, the infringement of claim 6 during the life of the '956 patent is precluded.

DeKalb asserts that the accused product reads on each and every one of the limitations set forth in claim 6. In its brief, DeKalb succinctly states its infringement analysis by Pioneer's YieldGuard product. As stated above, claim 6 incorporates the progeny derived from the plant of claim 5 and if someone without authority makes, uses, offers for sale or sells in the United States the progeny plant of claim 6 within the terms of the '956 patent, claim 6 has been infringed under section 271(a). John Hopkins Univ. v. Cellpro, Inc., 152 F.3d 1342, 1366 (Fed. Cir. 1998). DeKalb contents that Pioneer has done just that with the sale of YieldGuard. DeKalb argues that YieldGuard contains each and every element of claim 6 even when the limitations of claims 1 and 5 are incorporated into the language of claim 6.

The Special Master agreed with DeKalb's reading of claim 6 as the distinct "grandchild" of claim 1, stating:

> Thus, claim 6 requires a fertile transgenic corn plant that contains heterologous DNA encoding Bt endotoxin, and that expresses such DNA to exhibit resistence to an insect. Moreover, claim 6 requires that plant to have been derived, ultimately, from an R1 plant that was in turn derived from a fertile transgenic R0 plant regenerated from corn callus cells into which the heterologous DNA was introduced by microprojectile bombardment.

(SM R&R page 3).

When comparing claim 6 to Pioneer's YieldGuard corn product, the Special Master was not persuaded by Pioneer's argument that the temporal distinction regarding claim 1 precluded a finding of

infringement of claim 6.  Instead, the Special Master was
confident that the accused progeny plants - the YieldGuard
product - were produced during the term of the patent, after
issuance in early 1996.  The Special Master also found that claim
6, dependent in form, contains a limitation in addition to claims
1 and 5 which can be infringed apart from the infringement of
either claim 1 or 5.

In <u>Wilson Sporting</u>, the Federal Circuit considered
infringement of a dependent claim despite an earlier finding of
non-infringement of the independent claim.  As in <u>Wilson
Sporting</u>, claim 6 of the '956 patent is narrower than the claim
from which it depends and therefore can be infringed even though
the infringement of claims 1 and 5 are not considered.  Thus, the
Special Master found that in accordance with the earlier <u>Markman</u>
ruling, since claim 6 is directed to a product, the use of that
product simply requires employment of the product for some
purpose during the term of the patent.

Further, "the fact that some or all of the elements of the
claimed product were in existence before the patent issued should
not result in the avoidance of liability."  (SM R&R p. 4) (citing
<u>CellPro</u>, 152 F.3d at 1366).  Therefore, the Special Master's
Report and Recommendation suggests that it is possible that
Pioneer's YieldGuard product could read on each and every element
of claim 6 of the '956 patent, and the dependent nature of claim

10

6 does not preclude the possibility of such a finding. The Special Master concluded that a reasonable jury could indeed find that Pioneer's YieldGuard product infringes claim 6 of DeKalb's '956 patent and did not recommend the court grant Pioneer's motion for summary judgment for non-infringement.

As mentioned above, Pioneer and DeKalb filed objections to the Special Master's Report and Recommendation on non-infringement. Pioneer objects to the Special Master's reliance on the exception created by <u>Wilson Sporting</u> and also argues that his reading of paragraphs 2 and 4 of section 112 were clearly erroneous. Pioneer also objects to the Special Master's finding of infringement of claim 6 by the YieldGuard product, emphasizing the limitations of claims 1 and 5, when incorporated into claim 6, was seen to be neither a true product or true process claim and urges the court to apply the more restrictive law of process claims. DeKalb's objections, as further discussed below, focus on Pioneer's implied license defense and the Special Master's acceptance of that theory, albeit without the benefit of disclosure of the 2000 Agreement and the January 2, 2001 decision of the Missouri district court in the St. Louis litigation.

After consideration of the parties' arguments, the Special Master's Report and Recommendation concerning Pioneer's motion for summary judgment on non-infringement, and the objections

11

thereto on the issue of the infringement of dependent claim 6 of
the '956 patent, the court accepts the Special Master's findings.


### Pioneer's Implied License Argument

Pioneer's second argument in support of non-infringement
maintains that an implied license exists as a complete defense to
a finding of infringement.  Pioneer relies on an implied license
grounded in the 1993 and 2000 Agreements and the facts
surrounding the relationship of the parties pursuant to those
Agreements.

The existence of an implied license is a legal question.
Met-Cal Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 687
(Fed. Cir. 1986).  The alleged infringer bears the burden of
showing the establishment of an implied license.  Met-Cal, 803
F.2d at 687; see also Bandag, Inc. v. Al Bolser's Tire Stores,
Inc., 750 F.2d 903, 924 (Fed. Cir. 1984).  Therefore, Pioneer
bears the burden of proving, with clear and convincing evidence,
that an implied license arose through legal estoppel or through
Monsanto's conduct. Wang, 103 F.3d at 1582; Minnesota Mining &
Mfg. v. E.I. duPont de Nemours & Co., 448 F.2d 54 (7th Cir.
1971).

In 1993, Pioneer and Monsanto entered into a joint
development agreement to collaborate together to genetically
engineer and produce an elite Bt transgenic corn event called

Ezra or MON810.  In this agreement, Monsanto granted Pioneer a
license to use the Monsanto Bt technology to develop Bt corn for
commercial sale and Monsanto agreed to license certain aspects of
future access to Monsanto patented technology in exchange for $38
million from Pioneer.  As a result of Monsanto's and Pioneer's
efforts and obligations under the 1993 Agreement, Pioneer began
the manufacture and sale of its Bt Corn product derived from the
Ezra/MON810 event commercialized as YieldGuard.  It is this
YieldGuard product that is said to infringe the '956 patent in
the Rockford litigation.

On December 4, 1998 DeKalb became a wholly owned subsidiary
of Monsanto.  Currently, Monsanto controls the business of DeKalb
and has conceded that it now controls DeKalb's interest in this
litigation.  As of late 1998, at the time of DeKalb's
acquisition, Pioneer and Monsanto had a valid and enforceable
joint development agreement executed in 1993 to which DeKalb then
fell under.  The Rockford and St. Louis litigation proceeded
throughout Monsanto's 1998 acquisition of DeKalb.

On June 1, 2000, Monsanto, on behalf of itself and DeKalb,
entered into a partial agreement to settle certain issues of the
litigation pending in St. Louis, Rockford and Des Moines.  On
January 2, 2001 final judgment was entered on the jury verdict in
the St. Louis litigation which, for various reasons, terminated
the 1993 Agreement between Pioneer and Monsanto as of June 12,

1998.  Thus, this court addresses Pioneer's implied license argument in light of the facts surrounding the 1993 Agreement and reviews the language of the 2000 Agreement for the creation of the implied license sought by Pioneer.

### The 1993 Agreement

Pioneer argues that Monsanto, as owner of the '956 patent through its 1998 acquisition of DeKalb, cannot assert the infringement by YieldGuard while simultaneously offering this technology to Pioneer pursuant to the 1993 Agreement.  Reading the plain language of the 1993 Agreement, Monsanto granted a license to a list of Monsanto patents as well as a license to use Monsanto's future technology received prior to January 1, 2003 relating to the production of Bt corn seeds.  Indeed, provision 1.12 of the 1993 Agreement clearly states that if Monsanto owned information, data, know-how, genes, vectors or other related technology, Monsanto would be obligated to license such technology to Pioneer.  This provision would bind Monsanto even to later acquired patents, such as the DeKalb patent portfolio owned after December 4, 1998.  It is this express license from which Pioneer constructs its implied license defense.

The Special Master agreed with Pioneer that the law provides Pioneer the implied license to any dominant patent acquired by Monsanto subsequent to the express license granted in the 1993 Agreement.  AMP, Inc. v. US, 389 F.2d 448, 454 (Ct. Cl. 1968);

14

see also Minnesota Mining & Mfg. Co., 448 F.2d at 56; Hewlett-
Packard Co. v. Repeat-o-Type Stencil, 123 F.3d 1445 (Fed. Cir.
1997). However, as mentioned above, when the Special Master
filed his Report and Recommendation on November 9, 2000, he
operated under the assumption that the 1993 Agreement was still
in effect. As this court is now aware, the 1993 Agreement did
not survive to expiration; instead, it has been terminated by the
Missouri district court in the St. Louis litigation as of June
12, 1998. Thus, at the time this suit was filed by DeKalb in
1996, the '956 patent was not owned by Monsanto, nor was Monsanto
in the position to grant Pioneer a sublicense to the technology
embodied in the '956 patent. Moreover, on June 12, 1998, all
obligations of Monsanto to expressly authorize Pioneer to use its
technology, including all later acquired patents, ceased.
Therefore, any potential for an implied license arising from
Monsanto's obligations under the 1993 Agreement ended on June 12,
1998, before Monsanto owned the '956 patent.

The Special Master relied on Amp when he suggested that the
1993 Agreement would imply a license to any patents acquired
subsequent to the completion of the contract. However, the
contract in Amp, 389 F.2d at 454, which granted an express
irrevocable license from which an implied license was derived is
distinguishable from the ten-year license granted to Pioneer in
the 1993 Agreement. The license agreement in Amp did not contain

15

any provisions governing the termination or expiration of the license, whereas the license to Pioneer provided clear terms for the conduct of the parties and the handling of the licensed material at the end of the duration of the license. This indicates that Monsanto never intended to grant Pioneer an implied license under the 1993 Agreement, as opposed to what the parties intended in Amp, and undermines Pioneer's argument of the existence of an implied license based on the 1993 Agreement.

### The 2000 Agreement

Pioneer also argues that if it is found to infringe the '956 patent, Pioneer has a complete defense under an implied license evidenced by an interpretation of the terms and conditions of the 2000 Agreement. Pioneer contends that the 2000 Agreement not only recognizes the implied license "granted" by the 1993 Agreement but also asserts that the clear and unambiguous language of the 2000 Agreement grants Pioneer a separate license to the DeKalb patents. Pioneer interprets the language of the 2000 Agreement as an agreement between the parties that there will be absolutely no interruption of "Pioneer's fundamental right" to make its YieldGuard corn product.

Predictably, the parties now impart different views of legal significance to the 2000 Agreement. DeKalb disagrees with Pioneer's characterization of the 2000 Agreement. DeKalb finds the 2000 Agreement to be nothing more than an agreement to limit

16

the remedies available to the parties in anticipation of the entry of final judgment in the St. Louis litigation and any future decisions in the Rockford litigation. In so arguing, DeKalb relies on the title, provisions and context of the 2000 Agreement.

The existence of the 2000 Agreement was not fully disclosed to the court until after the Special Master's Report and Recommendation on non-infringement was filed. Consequently, this court was not afforded the benefit of the Special Master's opinion as to the impact of the 2000 Agreement on the issues of infringement or implied licenses. Thus, the court is faced with the task of interpreting the significance of the 2000 Agreement in accordance the law of this jurisdiction.

Federal courts apply the substantive law of the state in which it sits; therefore, under Illinois law, the governing law provision of the 2000 Agreement (Delaware law) will be applied. See Swiss Bank Corp. v. Dresser Indus., 141 F.3d 689, 609 (7th Cir. 1998) (applying Delaware state law in accordance with the governing law provision of the contract). Under Delaware law, the process of interpreting a contract proceeds in two steps. Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994). First, the court must make a preliminary inquiry as to whether the contract before it is ambiguous. Id. This question is an issue of law for the court to resolve. Id.

If no ambiguity is present, the court must give effect to the clear language of the agreement. <u>Johnston v. Tally Ho, Inc.</u>, 303 A.2d 677, 679 (Del. Super. 1973) ("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."); <u>see also</u> <u>Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.</u>, 616 A.2d 1192, 1196 (Del. Supr. 1992). In this case, "the true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." <u>Rhone-Poulenc</u>, 616 A.2d at 1196. Accordingly, the clear and unambiguous language in a contract can be interpreted as a matter of law pursuant to a motion for summary judgment. <u>Tamarind Resort Activities v. Government of the Virgin Islands</u>, 138 F.3d 107, 110-111 (3rd Cir. 1998).

In applying the relevant law, the court agrees with DeKalb that the 2000 Agreement is not ambiguous and a reading of its clear language does not grant Pioneer a license to the '956 patent. Instead, the 2000 Agreement memorializes, among other issues, the parties' intent and agreement to limit the damages, if any, owed to either party as a result of the St. Louis or Rockford litigation. First, the "new, royalty-bearing license"

18

language of paragraph 3(b) in the 2000 Agreement replaces the express license articulated in the 1993 Agreement which was fully paid-up, not royalty based. Paragraph 3(b) continues to explain that the arbitrated royalty rate will compensate both Monsanto and DeKalb for the intellectual property at issue in the St. Louis and Rockford litigation. The court need not interpret the purpose of this provision, for it is stated explicitly:

> The purpose of this provision [paragraph 3(b)] is to modify the remedies sought by Monsanto Settlors by replacing the Monsanto Settlors' current request for injunctive relief in connection with the Pioneer's Settlors' use of the MON810 event...with the remedy of future and/or continuing royalties for such use.

Therefore, the court concludes that the purpose of the 2000 Agreement, in conjunction with the clear language cited therein, was to serve as a settlement agreement pertaining to remedies only and not a grant of a license to Pioneer. Nor is the 2000 Agreement a waiver by DeKalb of past claims of infringement by Pioneer.

Pioneer is correct in asserting the "gap" and "no interruption" language in paragraph 3(b) of the 2000 Agreement to be the parties' agreement that whatever the outcome of the St. Louis and Rockford litigation, Pioneer will not be prevented from selling its YieldGuard corn product. That is, if the 1993 Agreement is terminated or if Pioneer is found liable to DeKalb for infringement, Pioneer would still be able to commercialize its YieldGuard corn product, subject to licensing terms to be

19

determined through arbitration. This language goes to the manner in which Monsanto will be compensated for harm incurred after the date the 1993 Agreement is terminated and lends nothing to Pioneer's potential liability to DeKalb up to the date of termination.

Thus, this court rejects Pioneer's implied license defense under the facts set forth above.

### Pioneer's Patent Exhaustion Argument

Similar to Pioneer's implied license defense, Pioneer's patent exhaustion argument is derived from the license granted by Monsanto to Pioneer in the 1993 Agreement. Pioneer contends that Monsanto's license was an exercise of all of the patent rights it owned as of 1993 and included all patent rights Monsanto would control at any time in the future. That is, Pioneer argues that DeKalb's present claims of patent infringement were exhausted through Monsanto's execution of the 1993 Agreement. DeKalb responds to Pioneer's patent exhaustion argument by distinguishing Monsanto's patent rights from DeKalb's patent rights at the time the 1993 Agreement was executed. DeKalb asserts that since Monsanto never owned the patent rights to the '956 patent at any time during the term of the 1993 Agreement, (up to and including June 12, 1998) Monsanto never had the ability to exhaust those rights through a license to Pioneer.

The law of patent exhaustion is well established:

20

> The full extent of the monopoly is the **patentee's**
> "exclusive right to make, use, and vend the invention
> or discovery." The **patentee** may surrender his monopoly
> in whole by the sale of his patent or in part by the
> sale of an article embodying the invention. His
> monopoly remains so long as he retains the ownership of
> the patented article. But the sale of it exhausts the
> monopoly in that article and the patentee may not
> thereafter, by virtue of this patent, control the use
> or disposition of that article.

United States v. Univis Lens Co., Inc., 316 U.S. 241, 250

(1942)(emphasis added); see United Printing Mach. Co. v. Cross

Paper Feeder Co., 220 F.322, 324 (D. Mass. 1915) ("A **patentee**

cannot sell his rights to another, and buy or obtain control of

an older patent, and, through such older patent, dispossess his

assignee of the full benefit of what he purchased.")(emphasis

added). Finally,"[t]he test has been whether or not there has

been such a disposition of the article that it may fairly be said

that the **patentee** has received his reward for the use of the

article." United States v. Masonite Corp., 316 U.S. 265, 278

(1942)(emphasis added); see also Cyrix Corp. v. Intel Corp., 846

F. Supp 522, 539 (E.D. Tex. 1994)(same). Thus, for a patentee's

rights in a patent to be exhausted, the **patentee** must relinquish

its monopoly afforded under the law. The law is clear that the

doctrine of patent exhaustion prevents the **patentee** from

dispossessing the rights granted to a licensee under a previous

license.

Pioneer argues that Monsanto exhausted DeKalb's patent rights through the license of the MON810 event in 1993 even though Monsanto had no authority over the '956 patent at that time. Pioneer cites Amp in support of its patent exhaustion argument. In Amp, the principle of patent exhaustion is discussed in the context of an implied license defense where the court held that "[a] patentee cannot sell his right to another and buy or obtain control of an older patent, and through such older patent, dispossess his assignee of the full benefit of what he purchased." Amp, 389 F.2d at 452. Again, since Monsanto was not the owner of the '956 patent at the time the license was granted, even under Amp, DeKalb's patent rights cannot be exhausted through any license between Monsanto and Pioneer. As discussed above, the Special Master also relied on Amp when it found that if a license was implied, in accordance with the doctrine of patent exhaustion, it would include any patents acquired after the completion of the contract from which the license was derived. As stated above, Amp is distinguishable from the present case because Monsanto was not the patentee at the time the licence was granted to Pioneer. Furthermore, the license granted in Amp was irrevocable and did not contain any provisions of termination or expiration indicating that the parties intended the authorized use of the licensed material would continue indefinitely. The 1993 Agreement however,

22

contains such termination and expiration provisions and both Monsanto and Pioneer agreed that Pioneer was to cease its use of the licensed MON810 event and the Monsanto technology at such time. Thus, the ability for Monsanto to exhaust any patent rights pursuant to the 1993 Agreement ceased upon the Agreement's termination on June 12, 1998, before Monsanto was the patentee or patent owner of the '956 patent.

For the above reasons, the court rejects Pioneer's argument of patent exhaustion in its motion for summary judgment of non-infringement.

### CONCLUSION

Pioneer has not met its burden of showing, by clear and convincing evidence, that claim 6 of DeKalb's '956 patent is not infringed by YieldGuard to warrant the entry of summary judgment in its favor. Pioneer has also failed to show that an implied license exists or patent exhaustion applies as defenses to DeKalb's claims of patent infringement. Thus, the court denies Pioneer's motion for summary judgment that the '956 patent is not infringed.

**E N T E R:**

**PHILIP G. REINHARD, JUDGE**
**UNITED STATES DISTRICT COURT**

DATED: Jany 30, 2001

23